IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 19-cr-00302-RBJ

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. STEPHEN J. YOBST,

    Defendant.

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

JUN 26 2019

JEFFREY P. COLWELL
CLERK

## INFORMATION

The United States Attorney charges that:

### Count 1
(Wire Fraud and Aiding and Abetting)

At all times relevant to this Information:

1. Xcel Energy Services, Inc. ("Xcel") was a national utility company providing power services through various subsidiaries throughout the United States to include the Public Service Company of Colorado.

2. Pacific Exchange Group, Inc. ("PEG") was a Colorado corporation incorporated and founded by James Brittain ("Brittain") on March 15, 2005. (*See U.S. v. Brittain*, Case No. 18-cr-301-RM, District of Colorado)

3. The defendant, STEPHEN JOSEPH YOBST ("YOBST"), was

employed by Xcel from approximately February 21, 2001, to October 1, 2009, and held various positions and titles during his employment. Specifically, from at least March of 2005, through the termination of his employment on October 1, 2009, YOBST was employed by Xcel as an officer holding the title of "Category Manager, Sourcing and Purchasing".

4. Starting in 2005, Xcel and PEG began negotiating the terms of a commercial contract. On December 5, 2006, Xcel and PEG entered into a commercial contract known as the Master Exchange Agreement ("MEA"). In simple terms, the MEA was designed to allow Xcel as a business to postpone paying taxes on gains received from selling certain assets if the sale proceeds were reinvested in similar property as a qualifying like-kind exchange. Such like-kind exchanges and the potential tax benefits from such transactions were permissible under the Internal Revenue Code § 1031.

5. PEG and Xcel's basic obligations under the MEA were as follows:

(A) PEG was required to maintain a bank account into which the proceeds from the sale of Xcel Energy's transformers and fleet vehicles would be deposited. Such proceeds – referred to as "exchange funds" – were to be held by PEG in trust on behalf

of Xcel. PEG was required to hold these exchange funds until directed by Xcel to distribute them for the purchase of replacement assets. PEG was required to provide Xcel with a detailed monthly accounting of such exchange funds.

(B) Xcel was to compensate PEG for its services under the MEA by providing a 5% commission on the sale price for vehicles and a 12% commission for transformers. In addition, with Xcel's "prior approval", PEG could be "reimbursed" for "out-of-pocket expenses" incurred for "professional legal and tax services and expenses." Neither PEG nor its agents were entitled to any other compensation or payments under the MEA.

### The Scheme

6. Beginning on or about March 15, 2005, and continuing through and including on or about May 14, 2015, in the State and District of Colorado, defendant STEPHEN YOBST and Brittain knowingly devised and intended to devise a scheme to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises from Xcel and aided and abetted the same.

7. As part of the scheme, YOBST and Brittain worked together at times to impermissibly divert, use and convert exchange funds for their personal benefit which funds they were

not entitled to receive under the terms of the MEA. Such exchange funds were above and beyond any compensation or payments which PEG was otherwise entitled to receive under the MEA.

8. As part of the scheme, on March 18, 2005, YOBST opened a bank account with Vectra Bank in Colorado in the name of "Pacific Exchange Group" (hereinafter "PEG Vectra account"). When opening the account, YOBST represented himself to be "President" of PEG. Brittain joined the PEG Vectra account as an authorized signatory on November 17, 2005. For the approximately next nine years, the PEG Vectra account served as the repository into which Xcel exchange funds were routinely deposited following the sale of Xcel vehicles and transformers.

9. As part of the scheme, YOBST and Brittain assisted each other and caused the following exchange funds to be taken from the PEG Vectra account while knowing that PEG was required to be holding such funds in trust for the benefit of Xcel:

(A) On January 15, 2009, YOBST wired $400,000 from the PEG Vectra account to a bank account which he controlled. The next day, on January 16, 2009, YOBST then transferred the $400,000 to a Scottrade Brokerage account which he held exclusively in his name. Both YOBST and Brittain, in a coordinated manner, then

utilized such funds over the next approximately four years to conduct multiple stock transactions and other investment activity in the Scottrade Brokerage account. The profits earned in the Scottrade Brokerage account were never returned to Xcel but instead were ultimately kept and used by YOBST and Brittain for their own personal use and consumption.

(B) From approximately August 2, 2009, through approximately December 31, 2014, YOBST -- with Brittain's approval, knowledge and assistance -- caused approximately $363,966 in payments from the PEG Vectra account to American Express in connection with personal expenditures made by YOBST.

(C) On approximately June 15, 2010, YOBST - with Brittain's approval, knowledge and assistance - caused $42,250 to be wired from the PEG Vectra account to Schomp Automotive in connection with the purchase of a 2011 Honda Pilot vehicle which was ultimately for the use and benefit of YOBST.

10. As part of the scheme, YOBST and Brittain, made or caused to be made materially false and fraudulent pretenses, representations and promises to include:

(A) During 2005 and 2006, XCEL and PEG were actively involved in discussions and negotiations related to the terms of the MEA. Brittain represented PEG during the negotiations.

During this period, YOBST participated directly in the contract negotiations on behalf of Xcel while employed in his capacity as an officer holding the title of "Category Manager, Sourcing and Purchasing". However, YOBST and Brittain purposely concealed from Xcel the fact that Brittain was in breach of his duty of loyalty to Xcel as an officer because YOBST: (1) was also working as a corporate officer for PEG at the same time; (2) had a financial stake in PEG; (3) had opened up the PEG Vectra bank account on March 18, 2005; and (4) was a joint signatory on the PEG Vectra account into which Xcel exchange funds were being deposited.

(B) From December 5, 2006, through October 1, 2009, while YOBST was still employed at Xcel, YOBST and Brittain purposely failed to provide Xcel with a detailed accounting of the disposition of exchange funds and avoided providing Xcel with PEG Vectra bank account statements. During this time period, YOBST and Brittain caused $400,000 in Xcel funds to be paid into a Scottrade brokerage trading account and began collecting monthly payments in the amount of $10,500 from the PEG Vectra account to "Havafund Inc." (a company owned by YOBST) and JDRE Inc. (a company owned by Brittain). During this entire time period, YOBST and Brittain continued to hide the fact that YOBST

was employed by both Xcel and PEG at the same time.

(C) On approximately September 4, 2014, Xcel filed a civil complaint against PEG in Minnesota State Court seeking an accounting of all exchange funds and a return of all unspent funds. During the course of the next approximately eight months, Brittain and YOBST, worked together to defeat Xcel's lawsuit by providing false and misleading information in connection with the litigation. Among other things: (1) Brittain drafted and caused YOBST to sign a false letter dated September 3, 2014; said letter misrepresented that YOBST recalled during the negotiations of the MEA, that Xcel's corporate officers had originally agreed to pay PEG's "programming fees" as a term of the MEA, and (2) Brittain falsely testified in a deposition on February 17, 2015, about the nature and length of time of his relationship with YOBST so as to hide the fact that YOBST had been working closely with Brittain as a PEG corporate officer since the inception of the company.

### The Wire

11. On or about November 25, 2014, in the State and District of Colorado, defendant YOBST, for the purpose of executing the scheme described above in paragraphs 1 through 10

of this Information, did cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, signals, pictures, and sounds, namely, a wire transfer of $154,000 from a Colorado based Scottrade brokerage account to a bank account in Montana, entitled "TriState Financial Services", which was an account controlled by and held for the benefit of Brittain.

All in violation of Title 18, United States Code, Sections 1343 and 2.

### Count 2
(Conspiracy to Defraud the United States)

12. Beginning in or about January 15, 2009, and continuing through and including February 15, 2015, in the State and District of Colorado and elsewhere, defendant STEPHEN J. YOBST, did voluntarily, intentionally and knowingly conspire, combine, confederate, and agree together and with another coconspirator, James Brittain, to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful Government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of revenue: to wit, personal income taxes due and owing for calendar years 2011 through 2014, and payment of past income taxes due and owing to the Internal

Revenue Service ("IRS") for calendar years 2001 through 2004.

## Manner and Means

The manner and means used by the Defendant and YOBST to further the conspiracy included the following:

13. It was part of the conspiracy that YOBST and Brittain worked together to generate income from the business PEG during the course of the conspiracy.

14. It was part of the conspiracy that YOBST and Brittain worked together to conceal the assessment and collection of personal income taxes owed to the IRS by Brittain for calendar years 2011 to 2014, as it related to the Brittain's PEG income by utilizing various means, including:

   (a) YOBST, as the personal tax return preparer for Brittain, completed false personal tax returns which substantially underreported Brittain's true income. Brittain then submitted such false returns to the IRS.

   (b) YOBST, as the accountant for PEG, caused to be prepared false W-2 Forms which substantially underreported Brittain's true income. The Defendant then submitted such false W-2 forms to the IRS when filing his tax returns.

   (c) YOBST, as the accountant for PEG, made monthly transfers of funds from PEG to Brittain, and YOBST purposely mischaracterized the payments on PEG Vectra bank account statements and corporate accounting as "ACH Offsets" to an entity labelled "JDRE", when in fact such funds transfers were direct income payments to Brittain.

15. It was part of the conspiracy that YOBST and Brittain attempted to avoid the collection of taxes due and owing by Brittain to the IRS for tax years 2001 through 2004. Specifically, as of August 24, 2007, Brittain owed back taxes to the IRS for his personal income returns as follows:

```
2001 - $24,738
2002 -  $3,529
2003 - $23,377
2004 - $34,514
```

In an effort to thwart and frustrate the IRS efforts to collect such back taxes after August 24, 2007, YOBST and Brittain took various steps to include:

    (a) having YOBST purchase a parcel of land in Montana for the benefit of Brittain using a corporation controlled by YOBST;

    (b) having YOBST maintain and utilize a stock trading brokerage account into which funds from PEG were transferred, and from which account both YOBST and Brittain conducted various stock transactions and generated personal income; and

    (c) having Brittain's personal income generated by the brokerage account be paid to a bank account held in the name of "Tristate Financial Services" which was a nominee company controlled by the Brittain.

## Overt Acts

16. On or about January 15, 2009, YOBST wired $400,000 from the PEG Vectra account to a bank account which he

controlled.

17. On or about January 16, 2009, YOBST then caused the transfer of the $400,000 to a Scottrade Brokerage account held exclusively in the name of YOBST.

18. On or about February 10, 2011, YOBST -- at Brittain's direction -- caused the transfer of $10,500 in funds from the PEG Vectra bank account to a bank account controlled by Brittain. In conducting the transaction, YOBST purposely mischaracterized the payment on PEG corporate accounting records and the PEG Vectra bank account statement as "ACH Offsets" to an entity labelled "JDRE".

19. On or about May 6, 2011, YOBST – while acting as a nominee on behalf of Brittain – purchased a parcel of land located at 212 High Road, Kalispel, Montana, ("Montana Parcel") for $320,000 using YOBST's company "Royal and Ross, Inc." as the purchaser.

20. On or about February 21, 2012, YOBST prepared Brittain's personal tax return Form 1040EZ and Form W-2 for calendar year 2011, which both falsely stated that Brittain's wage income was $30,330.

21. On or about March 19, 2012, Brittain filed a false personal income tax return with the IRS for calendar year 2011.

22. On or about April 8, 2013, YOBST prepared Brittain's personal tax return Form 1040EZ and Form W-2 for calendar year 2012, which both falsely stated that Brittain's wage income was $27,550.

23. On or about May 6, 2013, Brittain filed a false personal income tax return with the IRS for calendar year 2012.

24. On or about January 21, 2014, YOBST prepared Brittain's personal tax return Form 1040A and Form W-2 for calendar year 2013, which both falsely stated that Brittain's wage income was $21,600.

25. On or about November 10, 2014, Brittain filed a false personal income tax return with the IRS for calendar year 2013.

26. On November 25, 2014, YOBST wire transferred $154,000 from a Colorado based Scottrade brokerage account to a bank account in Montana, entitled "TriState Financial Services", which was an account controlled by and held for the benefit Brittain.

27. On or about February 23, 2015, YOBST prepared Brittain's personal tax return Form 1040A and Form W-2 for calendar year 2014, which both falsely stated that Brittain's wage income was $14,550.

28. On or about January 28, 2015, Brittain filed a false

income tax return with the IRS for calendar year 2014.

29. On or about February 5, 2015, YOBST transferred the Montana Parcel from his company "Royal and Ross, Inc." to an entity controlled by Brittain called "EA Whitefish Com, LLC."

All in violation of Title 18, United States Code, Section 371.

### Count 3
(Making and Subscribing a False Tax Return)

30. On or about March 2, 2017, in the State and District of Colorado, the defendant STEPHEN J. YOBST, a resident of Colorado, did willfully make and subscribe, a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2015, which was verified by a written declaration that it was made under penalties of perjury and which he did not believe to be true and correct as to every material matter. The income tax return, which was filed with the Internal Revenue Service, reported adjusted gross income of "-$11,618", total tax owed of $0, and a refund amount of $70 owed by the I.R.S., whereas, as he then and there well knew in truth and in fact, that his adjusted gross income was in excess of $1,000,000, total tax owed was over $200,000, and he was not entitled to a refund from the I.R.S.

All in violation of Title 26, United States Code, Section 7206(1).

**Count 4**
(Theft of Government Funds)

31. The Supplemental Nutrition Assistance Program ("SNAP"), formerly known as the Food Stamp Program, is a United States Department of Agriculture ("USDA") food assistance program for low-income individuals and families. SNAP is administered by the Food and Nutrition Service, providing federal funds to state and local governments that subsequently distribute the money to qualifying families for the purchase of food.

32. The amount of funds received by SNAP beneficiaries is determined by several factors, including household size and household income.

33. For eligible Denver residents, SNAP benefits are administered through Denver Human Services, which is authorized by the USDA to act on its behalf.

34. Beginning on or about December 26, 2012, and continuing through and including on or about August 30, 2017, in the State and District of Colorado, defendant STEPHEN YOBST, did knowingly steal, purloin, and convert to his own use money of the USDA, a department of the United States, that is, SNAP benefit funds totaling $12,968, having a value in excess of $1,000, to which he knew he was not entitled.

All in violation of Title 18, United States Code, Section 641.

## Forfeiture Allegation

35. The allegations contained in Counts One and Four of this Information are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

36. Upon conviction of the violation alleged in Counts One and Four of this Information involving the commission of violations of Title 18, United States Code, Sections 1343 and 641, defendant STEPHEN J. YOBST shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all of the defendant's right, title and interest in all property constituting and derived from any proceeds the defendant obtained directly and indirectly as a result of such offense, including, but not limited to:

a. $64,075.98 from JP Morgan Chase Bank Account Number 699730698;

b. $16,286.55 from JP Morgan Chase Bank Account Number 538397865;

    c. $29,175.00 from JP Morgan Chase Bank Account Number 532065773;

    d. $228,123.52 from JP Morgan Chase Bank Account Number 739580830;

    e. All funds held in Heritage International Bank, Belize, Account Number 704973;

    f. All funds held in Heritage International Bank, Belize, Account Number 600913;

    g. $400,598.78 from JP Morgan Chase Bank Account Number 3368318670;

    h. All funds held in Pershing Account Number 109168997; and

    i. A money judgment in the amount of proceeds obtained by the defendant and the scheme.

37. If any of the property described above, as a result of any act or omission of the defendant:

    a) cannot be located upon the exercise of due diligence;
    b) has been transferred or sold to, or deposited with, a third party;
    c) has been placed beyond the jurisdiction of the Court;
    d) has been substantially diminished in value; or
    e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28,

United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

JASON R. DUNN
United States Attorney

By: _____
TIM R. NEFF
Assistant United States Attorney
U.S. Attorney's Office
1801 California St., Suite 1600
Denver, CO  80202
Telephone: (303) 454-0100
Fax:  (303) 454-0402
E-mail:  tim.neff@usdoj.gov
Attorney for Government